Filed 3/2/23  P. v. Orlop CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

| |
|---|
| **California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.** |

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080897 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1500310) |
| VERNE RAYMOND ORLOP, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Riverside County, William S. Lebov, Judge.  (Retired Judge of the Yolo Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Verne R. Orlop, Jr., in pro. per.; and Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In 2017, a jury convicted Verne Orlop of first degree murder and found true an allegation that he personally used a deadly weapon (knife) in the commission of the offense (Pen. Code,[1] §§ 187 & 12022, subd. (b)(1)).  The

---

[1]     All further statutory references are to the Penal Code.

court found true a strike prior (§ 667, subds. (b)-(i)), a serious felony prior conviction (§ 667, subd. (a)(1)) and a prison prior (§ 667.5, subd. (b)).[2] Orlop was sentenced to of 50 years to life plus five years for the serious felony prior.

Orlop appealed and this court affirmed the judgment. (*People v. Orlop* (July 25, 2019, D075133) [nonpub. opn.].)

In 2022, Orlop filed a form petition for resentencing under section 1172.6 (formerly section 1170.95). The court appointed counsel and held a status hearing. At the hearing, the prosecutor advised the court that Orlop was prosecuted as the actual killer of the victim. The prosecutor advised that no jury instructions were given on aiding and abetting, felony murder, or natural and probable consequences. Defense counsel advised the court that the prosecutor's representations were accurate. Based upon the representations, the trial court summarily denied the petition for resentencing.

Orlop filed a timely notice of appeal.

Appellate counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), indicating counsel has not been able to identify any arguable issues for reversal on appeal. Counsel asks the court to review the record for error, consistent with the *Wende* procedure. We offered Orlop the opportunity to file his own brief on appeal. He has responded with two lengthy supplemental briefs. We will discuss those supplemental briefs later in this opinion.

## STATEMENT OF FACTS

Appellate counsel has provided a statement of facts from our opinion in the previous appeal. (*People v. Orlop, supra*, D075133.) We will adopt that statement here for convenience.

---

2.    The court struck the prison prior.

"Orlop and Denee Salisbury, both homeless, lived in the Palm Springs area. They had a contentious relationship. Salisbury was known to be loud and verbally aggressive. A former boyfriend said that Salisbury was sometimes violent when drunk, and that she had smashed a rock on his head. She was also known to fight with another homeless woman. Orlop testified that Salisbury, armed with a knife, had threatened to kill him and his girlfriend Julia D. many times. He also accused her of stealing clothing and money from Julia and of being violent toward others.

"Orlop could also be verbally abusive and had made threats to kill Salisbury and others. In 2011, Orlop was in a bar, 'ranting and raving,' threatening to kill a man with a hunting knife. He told the victim that he would cut the man's heart out. Orlop told a police officer that he was trying to stab and kill others. Orlop minimized his actions at trial but acknowledged that he pleaded guilty to a felony as a result of this attack in a bar.

"On February 6, 2015, about two weeks before the murder, Orlop called 911 complaining that Salisbury had been threatening to kill him and Julia. He threatened to kill Salisbury if the authorities did not remove her.

"A police officer contacted Orlop a few weeks later, on February 19, because Orlop and Julia refused to leave a bank. Orlop had a sheathed knife, a pocket knife, and a 20-inch wire garrote. He told the officer that he had the garrote '[t]o kill quickly and quietly.' The officer took the garrote but left the knives with Orlop.

"An officer saw Salisbury outside a restaurant on South Palm Canyon Drive in the early evening of February 21, 2015. Salisbury was agitated and yelling. She was responsive to the officer, however, and did not appear to be intoxicated. As the officer was talking with her, Orlop walked up to within

3

30 to 40 feet of the officer and Salisbury. Orlop was yelling and shouting. The officer could not hear what he was complaining about, but asked Orlop to walk away, which he did.

"Orlop testified that he walked up to the officer and asked that he arrest Salisbury because she was stalking him and his girlfriend and threatening to kill them both. The officer told Orlop that Salisbury was 'a little crazy' and left without talking with Orlop or acknowledging his request to arrest Salisbury.

"Near the restaurant, along South Palm Canyon Drive, were an abandoned car dealership and an abandoned bar. The desert stretched to the north and west from these empty buildings. Many transients, including Orlop and Julia, regularly camped in that desert area. After seeing Salisbury nearby, Orlop took Julia to a temporary camp hidden in the bushes nearby instead of returning to his regular camp, because he feared that Salisbury would hurt Julia.

"Orlop went back to the restaurant 30 to 45 minutes later. He claimed that on the way back, he heard Salisbury say that Orlop and Julia were 'dead' because Orlop had complained to the police about her. A female friend of Salisbury's bought some food for him and Julia. The friend said Orlop appeared to be neither intoxicated nor mentally ill. Orlop went back to his campsite with the food. The woman then went to talk with Salisbury, who was still in front of the restaurant, and bought her some food. Salisbury was calm and did not appear to be drunk. She declined her friend's offer to drive her to a shelter.

"Orlop testified that he heard Salisbury on the road, coming toward his temporary campsite hidden in the desert brush. She was yelling that she was going to kill Orlop and Julia. Orlop left his camp and walked toward

4

Salisbury to confront her. Salisbury started down the trail toward Orlop's temporary camp, then turned away and walked on the path alongside the abandoned dealership toward the desert area where Orlop and Julia regularly camped. Orlop chased after Salisbury after she turned away. He said, 'I was racing to catch up to her to confront her.' He had his knife in his back pocket.

"Orlop walked up to Salisbury from behind, passed her, and stopped when he was 15 to 20 feet in front of her. Orlop told Salisbury to leave him and Julia alone. Salisbury 'went insane' according to Orlop and threatened to kill him and Julia. Orlop said Salisbury put her hand in her bag and pulled it out. He thought she had something in her hand, but could not see what. Orlop testified that Salisbury quickly walked up to him and said that she was going to kill him and Julia, so he 'just reached up and . . . stabbed her.' He testified that he pulled the knife out of her and tried to leave but Salisbury came up to him again and repeated that she would kill Julia. Orlop testified that Salisbury fell or ran into his knife such that she was stabbed in her neck. He claimed he was afraid that he and/or Julia would be killed when he stabbed Salisbury.

"Orlop went back to his temporary camp and washed the blood from his arm and his knife. He hid the knife under a rock. He did not call for help for Salisbury, but said that he heard other people walking up to her and assumed they would call 911. Orlop took sleeping pills to fall asleep. He testified he had every right to defend his life. He felt redemption, not remorse, after killing Salisbury.

"Officers found Salisbury's body at about 8:10 p.m. that night, on the path leading to the transient camps. Salisbury was lying face down in a large pool of blood around her head and neck. A bag of her belongings was on her

5

arm.  Salisbury had a stab wound to the right side of her neck and a stab wound to the right upper part of her chest.  Both cuts were deeper than they were wide.  The stab to her neck cut her jugular vein.  It went two and a half inches deep, all the way to her spine.  The wound just above her right breast went about three inches deep, cutting through her lung and through her aorta.  Either stab wound would have been fatal by itself. Salisbury had no defensive wounds on her hands or arms.  She was intoxicated, with a blood alcohol level of 0.25 percent.

"The next morning, a volunteer officer stopped Orlop near the murder site and talked with him.  Orlop rambled on but did not appear to be intoxicated or mentally ill.  Orlop was cooperative.  He agreed to wait to speak with a detective.  Orlop permitted the volunteer to search him and take a folding knife from his pocket.  Orlop knew that Salisbury had been stabbed. Orlop told the volunteer that Salisbury was 'out of control' and that, 'It was justified.'  Another officer arrived and questioned Orlop.  This second officer also saw no signs of intoxication or mental illness.  Orlop did not tell either officer that Salisbury had any weapons or attempted to assault him.  Orlop said that he confronted Salisbury when she was alone because he did not want anyone else to be exposed to her evil.

"Detective Kyle Stjerne arrived and interviewed Orlop.  Orlop told the officer, 'I'm justified. . . .  [¶] 'I'm—I couldn't put up with it anymore.'  He said, 'I walked right up towards [Salisbury] and she started threatening me again and then that was it.  . . .  I justifiably took her life . . . .'  'I—I made sure no one was around when I took care of it.'  '[W]ell she started walkin' down the trail.  So I come up, walked up past her . . . .  That's when I got my knife and I opened it and I stood right in front of her and then she started, you know, saying she was gonna kill me.  And I just [¶] . . . [¶]  I killed her.

[¶] . . . [¶]  With my knife.  [¶] . . . [¶]  I took my knife, I put it this way and I went and she started again so I stabbed her in the heart to make sure I had a kill but I hit a double tap.  So I stuck it in her throat and went like that she went to the ground. . . .'  After killing her, Orlop washed his hands, wiped the knife, and hid it under a rock.  Orlop told the officers he had not used 'speed' (i.e., methamphetamine) for two or three days."

## DISCUSSION

As we have noted, appellate counsel has filed a *Wende* brief and asks the court to review the record for error.  To assist the court in its review, and in compliance with *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel has identified the following possible issues which were considered in evaluating the potential merits of this appeal:

1.  Did the trial court err in failing to follow the procedures mandated in section 1172.6?

2.  Did the trial court violate section 1172.6 by failing to conduct a prima facie evaluation of Orlop's petition?

3.  Did the trial court violate section 1172.6 by failing to provide a statement fully setting forth the reasons for denial?

4.  Did the trial court err in failing to allow Orlop to be physically present for a hearing?

Orlop filed two supplemental briefs.  The first, is a rambling discussion of his personal life and various involvements in the criminal justice system.  At base, he claims he was "framed" for the current offense as was the case for his previous conviction.  The second brief, submitted on a habeas corpus form which appears to allege his prior should have been dismissed because of the statute of limitations.  He contends we should order a psychological evaluation for him.

7

His discussions relate to matters outside the record in this appeal from the denial of a petition for resentencing. If Orlop has serious concerns that some injustice has occurred involving his conviction he should file a petition for habeas corpus in the trial court where a record could be developed. Orlop's supplemental briefs do not raise any arguable issues for reversal on this appeal.

We have reviewed the entire record consistent with *Wende* and *Anders*. We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented Orlop on this appeal.

## DISPOSITION

The order denying Orlop's petition for resentencing under section 1172.6 is affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.

8